**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**Aimee Williamson,**

**Plaintiff,**

**v.** **Case No.:**

**Hawthorne Brandon SNF Operations, LLC d/b/a Hawthorne Center for Rehabilitation of Brandon,**

**Defendant.**
_______________________________________/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, **Aimee Williamson**, (hereinafter "Plaintiff" or "Williamson"), by and through the undersigned counsel, hereby files this complaint against Defendant, **Hawthorne Brandon SNF Operations, LLC d/b/a Hawthorne Center for Rehabilitation of Brandon,** ("Defendant" or "Hawthorne") and alleges as follows:

## JURISDICTION AND VENUE

1. This is an action for damages and for declaratory relief, for violations of the Americans with Disabilities Act of 1990, as amended ("ADA", 42 U.S.C. §12101 *et seq.*) and the Florida Civil Rights Act ("FCRA," Fla. Stat. §760.01 *et seq.*).

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e et seq.

3. This Court has supplemental jurisdiction over Williamson's FCRA claims under 28 U.S.C. § 1367(a), because those claims arise from the same employment relationship, discriminatory treatment, protected complaints, and termination as her federal claims and form part of the same case or controversy.

4. Venue is proper in this District under 42 U.S.C. § 2000e-5(f)(3), incorporated into the ADA by 42 U.S.C. § 12117(a). Hawthorne employed Williamson at its Brandon facility in Hillsborough County, Florida; the unlawful employment practices occurred there; and Williamson would have continued working there but for Hawthorne's unlawful actions. Hillsborough County lies within the Tampa Division of this District.

## PARTIES

5. Plaintiff is an individual who, at all material times, resided in Hillsborough County, Florida.

6. Defendant is a Delaware limited liability company authorized to conduct business in Florida. At all material times, it operated a rehabilitation and skilled-nursing facility at 851 West Lumsden Road, Brandon, Florida 33511, and employed Plaintiff at that facility.

7. At all material times, Hawthorne engaged in an industry affecting commerce and employed at least fifteen employees for each working day in each of twenty or more calendar weeks in the relevant current or preceding calendar year. Hawthorne was Williamson's employer and a covered entity under 42 U.S.C. § 12111 and an employer subject to the FCRA.

8. The supervisors, administrators, regional managers, and Human Resources personnel identified below acted as Hawthorne's agents within the scope of their employment and exercised authority over Williamson's working conditions, evaluations, complaints, discipline, or continued employment.

## ADMINISTRATIVE EXHAUSTION AND CONDITIONS PRECEDENT

9. Plaintiff timely filed a verified administrative charge against Defendant with the Equal Employment Opportunity Commission ("EEOC"), alleging disability discrimination and retaliation under the ADA and FCRA. The charge was designated for dual filing with the Florida Commission on Human Relations ("FCHR") and assigned EEOC Charge No. 511-2025-022273.

10. The charge identified Hawthorne by the facility name under which it employed Williamson and described her wheelchair use, discriminatory treatment, internal complaints, and December 2, 2024 termination. Hawthorne received notice of the charge and responded through counsel on behalf of Hawthorne Brandon SNF Operations, LLC.

11. More than 180 days elapsed after the filing of Williamson's administrative charge before commencement of this action.

12. On July 21, 2026, the EEOC issued Williamson a Notice of Right to Sue on request and terminated its processing of the charge. Williamson brings this action within ninety days after receipt of that notice.

13. Williamson has exhausted the administrative remedies required for these claims and satisfied the prerequisites to a civil action under 42 U.S.C. § 12117 and Florida Statutes § 760.11.

14. All conditions precedent to this action have occurred, have been performed, or have been satisfied.

## FACTUAL ALLEGATIONS

15. Plaintiff worked for Hawthorne as a Medical Speech-Language Pathologist. She was employed in that capacity by August 25, 2022, and remained employed until Hawthorne terminated her on December 2, 2024.

16. Plaintiff has a physical impairment that substantially limits her ability to walk and stand. She uses a wheelchair for mobility and cannot stand to retrieve materials stored beyond her seated reach. She also experiences fine-motor limitations and episodes of disability-related pain.

17. Williamson's impairment and wheelchair use existed throughout the employment period relevant to this action. Hawthorne knew of her disability, wheelchair use, and mobility limitations.

18. Jessica Roca, Hawthorne's Director of Rehabilitation and Williamson's immediate supervisor, personally observed Williamson's wheelchair use and knew that she performed her clinical work from her wheelchair.

19. Hawthorne's Regional Director of Rehabilitation, Leah Voorhies; facility Administrator, Alex; and Human Resources personnel also knew of Williamson's disability.

20. Williamson held a master's degree in her field and the professional qualifications necessary to perform her position. Her work included evaluating and treating patients, developing and implementing treatment plans, completing clinical documentation, coordinating with other healthcare professionals, and addressing patients' speech, language, cognitive, and swallowing needs.

21. Williamson performed the essential functions of her position with or without reasonable accommodation. Her wheelchair enabled her to move through her work environment and provide speech-language pathology services.

22. During the period preceding her termination, Plaintiff was Hawthorne's only full-time Speech-Language Pathologist. She worked a schedule of four ten-hour days, Monday through Thursday, at an hourly rate of $45.

23. Plaintiff treated patients, maintained plans of care, completed progress notes and other documentation, and assisted with continuity of care when PRN or part-time therapists provided coverage.

24. Williamson completed company-offered AmpCare training and earned certification. She also hosted clinical students through Hawthorne's student-incentive program.

25. Hawthorne's 2024 evaluation credited Williamson with creative treatments, descriptive documentation, prompt responses to patient needs, and initiative in addressing nursing and interdisciplinary-team concerns. The evaluation recorded productivity of 89.1 percent and additional points for work beyond her ordinary duties.

26. Williamson remained able to perform her essential clinical duties at the time of her termination.

27. After Roca assumed supervisory responsibility over Williamson, Roca subjected her to a separate and more burdensome set of expectations than those imposed on non-disabled therapists.

28. Roca singled Williamson out for random audits, publicly belittled her, and imposed restrictions on her work that were not imposed on other therapists.

29. Roca attempted to discipline Williamson for overtime after authorizing her to remain at work to help resolve patient-diet issues when the kitchen's diet system was down.

30. Roca also restricted Williamson from performing evaluations or screenings even though Williamson was the only full-time Speech-Language Pathologist and other registered therapists were permitted to perform evaluations on new admissions.

31. Williamson repeatedly raised concerns about unequal treatment and discrimination with Roca, Human Resources, the Administrator, and the Regional Director, thereby engaging in protected activity.

32. Williamson personally purchased a bookshelf to keep therapeutic materials and equipment within reach from her wheelchair. The shelf held her own treatment activities and a personally purchased VitalStim machine.

33. Roca removed the bookshelf without notifying Williamson or obtaining her permission. Williamson's materials were left scattered on the floor and her desk, obstructing wheelchair maneuvering and making the materials difficult to access.

34. Williamson instructed Roca to replace the bookshelf and arrange the materials so that she could reach and use them. Roca consulted other team members about the placement of their storage furniture but did not extend the same consideration to Williamson's disability-related access needs.

35. Williamson's coworkers observed Roca's unequal treatment. Within the department, coworkers referred to Williamson as having a separate set of rules or a separate handbook from the rest of the team.

36. On August 7 and 8, 2024, Williamson experienced a flare-up of disability-related pain that required her to miss work.

37. Roca was away, so Williamson notified Regional Director Voorhies and Assistant Director of Rehabilitation Jennifer Haglund of her absences.

38. Williamson sent her August 7 notice at approximately 4:01 a.m. and her August 8 notice at approximately 4:09 a.m., at least two hours before the scheduled start of her shifts. Voorhies and Haglund acknowledged the notices.

39. On August 8, Human Resources and the Administrator contacted Williamson and threatened a write-up unless she reported to work or immediately produced a doctor's note.

40. Williamson reported to the facility while still in pain because of that threat.

41. During her meeting with management, Hawthorne acknowledged that it had made a mistake in demanding documentation for the two-day absence. Williamson became visibly distressed and cried, and management directed her to return home.

42. August 9 was a Friday and was not one of Williamson's scheduled workdays.

43. Hawthorne subsequently counted the two disability-related absences against Williamson in the dependability portion of her 2024 evaluation.

44. Hawthorne knew those absences resulted from a flare-up of Williamson's disability. Its treatment of the absences subjected her to additional pressure and scrutiny because of her disability.

45. In September 2024, Hawthorne presented Williamson with a revised Speech-Language Pathologist job description for signature.

46. The revised description required the ability to walk, bend, stand, and reach "constantly" during an eight-hour day or shift.

47. It also required frequent lifting of residents using biomechanical techniques, the ability to lift, push, pull, and move at least fifty pounds, and the ability to push wheeled equipment throughout the clinic and facility.

48. The revised description further required fine-motor skills for legible and accurate handwritten reports, charting, and manual scheduling.

49. The earlier description specified occasional lifting, moving, pushing, or pulling of up to twenty pounds. The revised fifty-pound requirement and constant walking-and-standing requirement materially increased the stated physical demands of Williamson's position.

50. Those increased demands did not reflect the work Williamson actually performed. Williamson provided speech-language pathology services from her wheelchair, and patient orders were entered electronically.

51. Constant walking and standing, frequent resident lifting, and pushing wheeled equipment were not necessary for Williamson to perform her actual speech-language pathology duties.

52. Williamson reviewed the updated Physical Therapy and Occupational Therapy descriptions supplied at that time. Those descriptions did not contain the same targeted changes presented to her.

53. Hawthorne imposed the heightened physical requirements on Williamson despite its knowledge of her wheelchair use and her demonstrated ability to perform her job. Those requirements targeted her known physical limitations rather than her ability to evaluate, treat, and document care for patients.

54. On October 29, 2024, full-time Physical Therapist Tina Schwind experienced a serious choking episode in the rehabilitation gym.

55. Later that day, Schwind and Williamson discussed the episode, choking-response procedures, and the location of suction equipment in the facility.

56. Roca interrupted the conversation, aggressively challenged Williamson’s account of prior emergency experiences, and spoke down to her in front of Schwind.

57. Williamson explained that during a prior patient emergency, the gym telephones lacked a paging option and the telephone with that capability was in Roca's office beyond Williamson's accessible reach. Williamson requested that staff receive written emergency procedures and information about the location of suction equipment.

58. On October 30, 2024, Williamson met with Roca in Roca's office and directly complained about Roca's discriminatory treatment.

59. Williamson told Roca that she had been demeaning and belittling her since becoming Director of Rehabilitation and that other team members had observed the different treatment.

60. Williamson specifically raised whether Roca's treatment resulted from a discriminatory issue with Williamson's use of a wheelchair.

61. Williamson identified concrete examples: removal of her accessible bookshelf without consultation; attempted discipline for previously authorized overtime; restrictions on her evaluations and screenings; different job-description requirements; and unequal handling of documentation and patient assignments.

62. Roca stopped the discussion and stated that she would not continue speaking with Williamson until Voorhies arrived.

63. After Voorhies arrived, Roca and Voorhies met with Schwind, but Williamson was not permitted to finish presenting her complaint. Hawthorne did not reconvene the discussion with Williamson before her termination.

64. Williamson documented the October 29 incident and October 30 discrimination complaint in a written statement submitted to Human Resources. She expressly identified her wheelchair use and requested fair and respectful treatment.

65. Through the direct October 30 conversation and Williamson's written complaint, Roca and Hawthorne had actual notice that Williamson opposed discriminatory treatment because of her wheelchair use.

66. Williamson also performed PRN speech-language pathology work outside her full-time Hawthorne schedule. Other Hawthorne therapists likewise held PRN positions at other facilities.

67. On or about November 18, 2024, Williamson learned that Roca had contacted a full-time Speech-Language Pathologist at a facility where Williamson performed weekend PRN work.

68. Roca's message identified Williamson as Roca's current full-time Speech-Language Pathologist and stated that Roca had heard Williamson was providing PRN services at the other facility.

69. Roca had not been provided as Williamson's reference. Williamson had not told Hawthorne that she was leaving her full-time position, and her outside work did not interfere with her Hawthorne schedule.

70. Roca singled out Williamson's outside employment for inquiry while not making comparable inquiries into other therapists' PRN work.

71. On November 18, 2024, Williamson submitted another written complaint to Human Resources about Roca's targeting, harassment, and discrimination. She described the contact with her other workplace, contrasted it with Roca's treatment of other therapists, and asked that the conduct stop so that she could perform her job in peace.

72. Hawthorne received and investigated Williamson's complaint concerning Roca's contact. Hawthorne's management and Roca therefore knew of Williamson's renewed opposition to discriminatory treatment before the December 2 termination.

73. On or about November 7, 2024, Hawthorne conducted Williamson's annual review. Roca, the Administrator, Human Resources, and regional management participated in the review process.

74. Williamson's evaluation recognized her clinical strengths, certifications, student supervision, and additional contributions to the department.

Hawthorne documented those contributions during the same review process in which Williamson was denied a raise.

75. Hawthorne denied Williamson a raise at that review while other therapists received raises or bonuses. Roca discussed other therapists' compensation aloud and instructed them not to discuss the raises or bonuses they had received because Williamson had not received one.

76. Hawthorne denied Williamson a merit increase while continuing to rely on her as its only full-time Speech-Language Pathologist. That denial occurred after Williamson's October 30 complaint about Roca's disability discrimination.

77. Hawthorne used company-provided computers to access patient records, clinical documentation, and billing systems, including PointClickCare ("PCC") and Net Health.

78. PRN and part-time therapists needed access to those systems to review patient information, document treatment, and bill for their services.

79. Hawthorne failed to ensure that incoming coverage staff consistently had their own functioning credentials before beginning work. Those employees contacted Williamson when they could not access the systems.

80. On November 7, 2023, Williamson texted Roca to ask whether she had Gabby's login information for PCC and Net Health because Gabby was coming to review procedures.

81. Roca responded: "I'll get it from Leah tomorrow and get it for her. She can look under yours for now."

82. On November 10, 2023, Gabby contacted Williamson from Hawthorne and asked whose Net Health login she should use. Gabby stated that she had no login information and could not document or bill. Williamson directed Gabby to contact Roca for her own access.

83. Williamson repeatedly requested that Hawthorne provide PRN and part-time staff their own usernames and passwords rather than leave coverage staff without access.

84. Williamson also discovered that the browsers on Hawthorne's computers retained employee login information, enabling other users of those computers to access saved credentials.

85. Williamson repeatedly reported that problem to Roca, Human Resources, Voorhies, and the Administrator and requested that the browser-saving feature be disabled.

86. Hawthorne did not provide an effective solution to Williamson's reports. Management knew both that staff encountered access problems and that Roca had directed temporary access under Williamson's account.

87. Williamson performed documentation and ate working lunches at her desk in the rehabilitation gym, directly across from Roca's office. The employee

breakroom had heavy doors, inadequate wheelchair space, and a coded entry that was difficult for Williamson to operate because of her fine-motor limitations.

88. Hawthorne later used access to Williamson's credentials as the stated basis for terminating her, notwithstanding Roca's express instruction, Williamson's repeated requests for individual credentials for coverage staff, and her reports about saved browser credentials.

89. On December 2, 2024, Hawthorne terminated Williamson's employment, citing password sharing and access to her login information by other therapists.

90. Roca participated in the events and accusations underlying the termination. She was also the supervisor whose disability discrimination Williamson had directly challenged on October 30 and again in her November 18 written complaint.

91. Hawthorne's termination followed Williamson's October 30 express complaint of wheelchair discrimination and her November 18 written complaint by only a matter of weeks.

92. Hawthorne seized upon the credential-access issue to remove Williamson after she challenged Roca's discriminatory treatment. The asserted policy justification concealed Hawthorne's disability discrimination and retaliation.

93. Hawthorne attributed responsibility to Williamson for an access practice that her own supervisor had directed and for computer-security conditions that Williamson had repeatedly asked management to correct.

94. Hawthorne terminated Williamson because of her disability and because she opposed discriminatory treatment. Williamson would not have been terminated in the absence of disability discrimination, and she would not have been terminated in the absence of retaliation for her protected complaints.

95. Hawthorne's managers received Williamson's complaints, knew that she was raising disability discrimination, and nevertheless permitted the targeted treatment to culminate in her termination.

96. Hawthorne's termination deprived Williamson of her full-time position, regular earnings, and other employment compensation. Williamson has sustained wage loss and other economic harm in amounts to be established at trial.

97. Hawthorne's discriminatory and retaliatory conduct caused humiliation, anxiety, depression, insomnia, and loss of dignity and worsened Williamson's physical symptoms, including migraines and pain. She sought medical and mental-health treatment and incurred related expenses.

98. The loss of full-time employment caused substantial financial distress and anxiety about meeting her housing expenses, maintaining necessary disability-

related services, and maintaining the vehicle and home modifications on which her independence depends.

99. Williamson has continued performing PRN and part-time speech-language pathology work and has undertaken efforts to mitigate her lost earnings.

100. Williamson retained undersigned counsel to enforce her rights and has incurred and will continue to incur attorneys' fees, litigation expenses, and costs.

## COUNT I – FCRA VIOLATION (DISABILITY/HANDICAP DISCRIMINATION)

### Florida Statutes § 760.10(1)(a)

101. Williamson incorporates paragraphs 1 through 100 as the factual allegations supporting this count.

102. At all material times, Hawthorne was an employer subject to the FCRA, and Williamson was its employee.

103. Williamson's physical impairment, including her substantial limitations in walking and standing and her need for a wheelchair, constituted a protected handicap under the FCRA. Hawthorne knew of that impairment and those limitations.

104. Williamson possessed the qualifications required for her Medical Speech-Language Pathologist position and could perform its essential functions with or without reasonable accommodation when Hawthorne terminated her.

105. Hawthorne intentionally discharged Williamson because of her disability, in violation of Florida Statutes § 760.10(1)(a).

106. Hawthorne's discriminatory intent is reflected in Roca's unequal rules and scrutiny, the treatment of Williamson's disability-related absences, the increased physical demands directed at her wheelchair limitations, the unequal compensation treatment, Roca's targeting of her outside employment, and the use of the credential-access issue to terminate her.

107. Williamson's disability was a but-for cause of her discharge. Hawthorne's stated password-sharing reason was a pretext for disability discrimination.

108. Hawthorne acted intentionally and with malice or reckless indifference to Williamson's protected rights. Its managers knew of her disability and received her express complaints of disability discrimination before authorizing or implementing the termination.

109. As a direct and proximate result, Williamson sustained lost earnings and employment compensation, emotional distress, humiliation, mental anguish, loss of dignity, treatment expenses, and other compensable injuries.

110. Williamson is entitled to relief under Florida Statutes § 760.11.

**WHEREFORE**, Williamson requests judgment against Hawthorne on Count I; back pay and lost employment compensation with interest; reinstatement or front

pay in lieu of reinstatement; compensatory damages, including mental anguish, loss of dignity, and treatment expenses; punitive damages as authorized by the FCRA; reasonable attorneys' fees and costs; appropriate equitable relief, including correction of employment records reflecting the unlawful termination; and all other relief the Court deems just and proper.

**COUNT II –RETALIATION UNDER THE FCRA**

**Florida Statutes § 760.10(7)**

111. Williamson incorporates paragraphs 1 through 100 as the factual allegations supporting this count.

112. Williamson engaged in protected opposition to disability discrimination by directly confronting Roca on October 30, 2024, about disparate treatment because of her wheelchair use; submitting her written complaint concerning that conduct to Human Resources; and submitting her November 18, 2024 written complaint requesting that Roca's discriminatory targeting stop.

113. Williamson sincerely and reasonably believed that Hawthorne was subjecting her to unlawful disability discrimination. Her complaints identified the unequal treatment and its connection to her disability.

114. Hawthorne knew of Williamson's protected opposition through Roca, Human Resources, and the managers who received or addressed her complaints.

115. Hawthorne thereafter terminated Williamson's employment on December 2, 2024. Termination was a materially adverse action that would deter a reasonable employee from opposing disability discrimination.

116. Hawthorne terminated Williamson because she engaged in protected opposition, in violation of Florida Statutes § 760.10(7). Her protected complaints were a but-for cause of the termination.

117. The short interval between Williamson's specific discrimination complaints and her termination, Roca's role in the complaints and termination events, management's knowledge, and Hawthorne's use of the credential-access issue establish the causal connection between her protected activity and discharge.

118. Hawthorne's password-sharing explanation was a pretext for retaliation. Hawthorne intentionally used that explanation to terminate an employee who had challenged her supervisor's discriminatory treatment.

119. Hawthorne's retaliation was intentional and committed with malice or reckless indifference to Williamson's protected rights. Its retaliation caused the economic and non-economic injuries described above.

120. Williamson is entitled to relief under Florida Statutes § 760.11.

**WHEREFORE**, Williamson requests judgment against Hawthorne on Count II; back pay and lost employment compensation with interest; reinstatement or front pay in lieu of reinstatement; compensatory damages, including mental anguish, loss

of dignity, and treatment expenses; punitive damages as authorized by the FCRA; reasonable attorneys' fees and costs; appropriate equitable relief, including correction of employment records reflecting the retaliatory termination; and all other relief the Court deems just and proper.

**COUNT III – DISABILITY DISCRIMINATION UNDER THE ADA**

**42 U.S.C. § 12112(a)**

121. Williamson incorporates paragraphs 1 through 100 as the factual allegations supporting this count.

122. Hawthorne was Williamson's employer and a covered entity under the ADA.

123. Williamson has an actual disability within the meaning of 42 U.S.C. § 12102(1)(A): a physical impairment substantially limiting walking and standing. Her wheelchair use and inability to stand to retrieve materials demonstrate those limitations.

124. Hawthorne knew of Williamson's actual disability. It also regarded her as having a physical impairment and subjected her to adverse treatment because of that impairment.

125. Williamson was a qualified individual under 42 U.S.C. § 12111(8). She possessed the necessary education and professional qualifications and could perform

the essential functions of her Speech-Language Pathologist position with or without reasonable accommodation at the time of discharge.

126. Hawthorne intentionally terminated Williamson on the basis of disability, in violation of 42 U.S.C. § 12112(a).

127. Roca's differential rules and scrutiny, interference with Williamson's accessible materials, treatment of disability-related absences, heightened physical requirements, unequal compensation treatment, and involvement in the termination events demonstrate the discriminatory course of conduct culminating in Williamson's discharge.

128. Williamson's disability was a but-for cause of her termination. The password-sharing explanation was a pretext for disability discrimination.

129. Hawthorne acted with malice or reckless indifference to Williamson's federally protected rights. Its management knew of her disability and her express discrimination complaints and nevertheless authorized or implemented her discriminatory termination.

130. Hawthorne's unlawful discrimination directly and proximately caused Williamson's lost earnings, economic losses, emotional pain, humiliation, mental anguish, treatment expenses, and other compensable harm.

**WHEREFORE**, Williamson requests judgment against Hawthorne on Count III; back pay and lost employment compensation with interest; reinstatement or front

pay in lieu of reinstatement; compensatory and punitive damages under 42 U.S.C. § 1981a; reasonable attorneys' fees, litigation expenses, and costs under 42 U.S.C. § 12205; appropriate equitable relief, including correction of employment records reflecting the discriminatory termination; and all other relief the Court deems just and proper.

## COUNT IV – RETALIATION UNDER THE ADA

## 42 U.S.C. § 12203(a)

131. Williamson incorporates paragraphs 1 through 100 as the factual allegations supporting this count.

132. Williamson engaged in statutorily protected opposition when she complained directly to Roca on October 30, 2024, that Roca was treating her differently because she used a wheelchair; documented that discrimination in her written submission to Human Resources; and renewed her opposition to discriminatory targeting in her November 18, 2024 written complaint.

133. Williamson had a good-faith and objectively reasonable belief that the treatment she opposed violated the ADA. She identified specific differences in her treatment, explained their connection to her wheelchair use, and requested that the discrimination stop.

134. Hawthorne had actual knowledge of Williamson's protected activity through Roca, Human Resources, and the management personnel who received or addressed the complaints.

135. Hawthorne took materially adverse action against Williamson by terminating her employment on December 2, 2024.

136. Hawthorne terminated Williamson because she opposed disability discrimination, in violation of 42 U.S.C. § 12203(a).

137. Williamson's protected opposition was a but-for cause of the termination. Hawthorne would not have terminated her absent that protected opposition.

138. Hawthorne's knowledge of the complaints, Roca's involvement in both the challenged conduct and termination events, the close timing, and the pretextual use of the credential-access issue connect Williamson's protected opposition to her discharge.

139. Hawthorne's retaliation directly and proximately caused Williamson to lose her full-time position and earnings and to incur other economic harm.

140. Williamson is entitled to the remedies and procedures provided by 42 U.S.C. § 12203(c) and 42 U.S.C. § 12117.

**WHEREFORE**, Williamson requests judgment against Hawthorne on Count IV; back pay and lost employment compensation with interest; reinstatement or front

pay in lieu of reinstatement; appropriate equitable relief, including correction of employment records reflecting the retaliatory termination; reasonable attorneys' fees, litigation expenses, and costs under 42 U.S.C. § 12205; and all other relief available for this violation.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury as to all issues.

Dated this 16th of October 2026.

Respectfully submitted,

*/s/ Samuel Doxsee*

**SAMUEL DOXSEE**
Florida Bar Number: 127318
**CHAD A. JUSTICE**
Florida Bar Number: 121559
**JUSTICE LITIGATION ASSOCIATES, PLLC**
1205 N Franklin St., Suite 326
Tampa, Florida 33602
Direct No. 813-566-0550
Facsimile: 813-566-0770
E-mail: sam@justicelitigation.law
E-mail: chad@justicelitigation.law
**Attorneys for Plaintiff**